### AFFIDAVIT OF BORDER PATROL AGENT Allen W Walker

Your affiant, Allen W. Walker, Border Patrol Agent - Intelligence of the United States Border Patrol, being duly sworn, does depose and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1) I am a Border Patrol Agent- Intelligence (BPA-I) with the United States Border Patrol (USBP) currently assigned to Tucson, Arizona. I have been an agent with the USBP since June 2007. I completed the USBP Academy in October of 2007, where I received instruction in constitutional law, immigration law, criminal law, and federal and civil statutes. I have also received instruction in the detection, interdiction, and arrest of narcotics smugglers, alien smugglers, and aliens illegally present in the United States.

2) Since July 28, 2013, I have been assigned as a BPA-I assigned to the Tucson Sector Intelligence Unit. As part of my duties, I have conducted investigations involving illegal activity, and have gathered facts and evidence pertaining to administrative and criminal cases. I have taken statements from material witnesses and suspects. I routinely perform records checks through various law enforcement databases to establish accuracy of information, as well as gather facts relevant to respective cases. I have worked with several other agencies to seek criminal prosecutions of subjects involved in the violation of federal laws.

3) The statements contained in this affidavit are based on information provided by fellow Border Patrol Agents and on my experience as a BPA-I in the USBP. Since this affidavit is submitted for the limited purpose of securing a search warrant, I have not included all facts known to me regarding this investigation. I have set forth facts that establish probable cause to believe that the suspects/defendants referred to in this investigation conspired with each other and other known and unknown individuals, wherein they jointly facilitated, either verbally or electronically,

the trafficking of controlled substances into and within the United States. This affidavit is intended to show only that there exists sufficient probable cause for the requested warrant and does not portray all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4) The property to be searched consists of a cellular phone. The cellular phone to be examined is a purple iPhone. The cellular phone has been identified as the property of Jon SCHACHT. This phone is referred to as the Target Phone. The Target Phone is secured inside the Tucson Station Seized Property Vault in Tucson, Arizona. The Target Phone is sealed in a Department of Homeland Security evidence bag with a signed Form 6051S Custody Receipt for Seized Property and Evidence.

5) The requested warrant would authorize the forensic examination of the Target Phone for the purpose of identifying electronically stored data to include: any telephone numbers, including but not limited to numbers called, numbers stored for speed dial, pager numbers, names and addresses, electronically stored voice and text messages, calling card numbers, text messages, photos, videos and/or identifying information that may be stored in the memory of the Target Phones, for items described in Attachment A (incorporated herein by reference).

### PROBABLE CAUSE

6) On May 24, 2023, Border Patrol Agents assigned to the Tucson Station BAIT Team, in conjunction with Border Patrol Intelligence Agents assigned to Tucson Sector Intelligence Unit BEAST were monitoring a mobile tracking device (MTD) that had been placed on Jon SCHACHT's vehicle via warrant No. 23-01619MB, authorized by U.S. Magistrate Judge Bruce Macdonald on May 9, 2023. This warrant was granted to assist agents in an investigation into the suspected alien

smuggling activities of SCHACHT and his associates. Agents were also conducting mobile surveillance on Jon SCHACHT as part of the investigation.

7) The agents set a loose perimeter around the Casino Del Sol on Valencia Avenue as this was the location provided by the MTD. An agent entered the casino and confirmed SCHACHT was present. The agent observed SCHACHT at a slot machine with Michael ABRIL. The agent was able to identify both subjects. The agent observed SCHACHT take a phone call from an unknown person. The agent then observed both subjects leave the casino. Shortly after the two subjects left the casino, the Target Vehicle left the casino parking lot. Agents maintained a loose mobile surveillance on the vehicle, allowing the MTD to provide information as to the location and activities of the Target Vehicle.

8) The agents followed the Target vehicle to a residence located at 2945 South Forgeus Avenue in Tucson, AZ. An agent was able to get to a location where he observed SCHACHT was talking to an unknown subject at the residence. Initial research of this residence revealed ties to subjects that have been identified as being involved in alien smuggling. The agents were then able to observe the Target Vehicle exit the residence. Half of the agents assigned to the surveillance followed SCHACHT from the residence, and the remaining agents maintained a visual of the unknown subject.

9) The team that maintained surveillance of the Target Vehicle were travelling westbound on Interstate 10 (I-10) towards Phoenix. SCHACHT has been known to go to Phoenix and return after only a brief stay. This fact, in conjunction with other facts learned through the investigation led the agents to suspect SCHACHT may be involved in criminal activity. The Agents assigned to the BAIT unit contacted a Pinal County Sheriff's Deputy, explained the situation, and asked for assistance with a traffic stop. The deputy agreed to assist and set up near mile marker 206. As soon as SCHACHT observed the deputy, SCHACHT cut across three lanes of traffic and immediately exited I-10. The

deputy was unable to follow SCHACHT. So the deputy pulled off the road to wait for the Target Vehicle to pass. SCHACHT pulled into a gas station near the exit. SCHACHT was only there about ten minutes before he re-entered traffic on I-10.

10) As soon as the deputy saw the Target Vehicle, he initiated a traffic stop for unsafe lane change. During the traffic stop another deputy arrived to assist. The second deputy deployed his service canine and conducted a free-air sniff of the Target Vehicle. The canine displayed alert behavior. A search of the Target Vehicle revealed a black tote with a yellow lid. Inside the tote were thirty-nine (39) bundles. The deputy opened one of the bundles and observed blue pills that appeared similar to fentanyl pills. After the pills were tested, they were determined to be 42.6 kilograms of fentanyl.

11) The deputies placed SCHACHT and his passenger Michael ABRIL under arrest and notified the agents of their findings. The Agents took custody of the narcotics, the vehicle and both subjects. SCHACHT was advised of his *Miranda* rights and stated he understood them. ABRIL was also advised of his rights and stated he understood them. Both subjects, and the narcotics, were transported to the Tucson Coordination Center (TCC) at the Tucson Border Patrol Station for further processing.

12) At the TCC, SCHACHT was reminded of his rights and agreed to make a statement without the presence of an attorney. SCHACHT stated he was at the Casino Del SOL with Michael ABRIL, and he received a phone call from a friend named Irvin. SCHACHT stated "Irvin" asked him to go to a house in Tucson and get $300 USD and take it to Phoenix. SCHACHT stated he was already planning to go to Phoenix, so he agreed.

13) SCHACHT stated when he arrived at the residence near Kino Parkway, he met a subject known as "CHUEY" and asked him for the money. CHUEY didn't have the money. SCHACHT

stated he called Irvin to inform him. SCHACHT stated Irvin told him to go to an address in Phoenix to get the money. SCHACHT stated before he left, he asked if he could use the restroom. SCHACHT stated he left his car running with the air conditioning on while he used the restroom. SCHACHT stated he believed this is when CHUEY put the tote in his vehicle.

14) SCHACHT stated CHUEY asked him to share his location. SCHACHT stated that even though he thought it was a weird request, he did it anyway.

15) Michael ABRIL, the co-conspirator arrested with SCHACHT, also provided a post-*Miranda* statement to agents.

16) ABRIL stated SCHACHT offered to give him money in exchange for travelling to Phoenix, AZ to drop off narcotics with SCHACHT. ABRIL stated SCHACHT made the offer while they were gambling at the Casino Del Sol in Tucson, AZ.

17) After agreeing to the offer, SCHACHT and ABRIL left the casino and drove to an area near Kino Parkway to pick up the narcotics. ABRIL stated since he did not know the person they would be getting the narcotics from, SCHACHT dropped him off at a fast food restaurant while SCHACHT went to pick up the narcotics.

18) SCHACHT left ABRIL at the restaurant, picked up the narcotics, and returned to get ABRIL at the restaurant. ABRIL stated SCHACHT explained that "CHUEY" instructed SCHACHT to remain in the vehicle while the narcotics were placed in the trunk. ABRIL stated SCHACHT then drove back to the restaurant to pick him up. ABRIL stated SCHACHT did not inspect the contents in the trunk. ABRIL state that both he and SCHACHT thought they were only transporting a few pounds of methamphetamine. ABRIL was under the impression that SCHACHT was to be paid approximately $1,500.00 USD. ABRIL claimed to not know how much SCHACHT was going to pay him for accompanying SCHACHT during the smuggling event.

19) SCHACHT has been the subject of an ongoing investigation by U.S.B.P. Agents for violations of 8 USC 1324.

20) On March 21, 2023, Border Patrol Agents assigned to the Tucson Station BAIT Unit were on duty and observed SCHACHT driving the white Audi A6 bearing AZ license plate BMA4VJ sitting at a McDonalds drive-through. The agents observed SCHACHT leave the drive-through and meet with two additional subjects in separate vehicles. One of the vehicles was the GMC pickup truck bearing AZ license plate TBA6SB and a Nissan Titan. The agents observed SCHACHT give both drivers coffee. The agents observed all three vehicles leave together.

21) The agents were able to follow all three vehicles to a Motel 6 located at 1010 S. Freeway Tucson, AZ 85745. SCHACHT parked the Audi and entered the lobby of the Motel 6. The Titan and the Audi drove to the rear of the motel. The agents set a perimeter around the motel conducting surveillance. A short time later agents observed all three vehicles leave the motel.

22) Later that afternoon, agents observed the Nissan Titan return to the motel. As the Titan left agents conducted a vehicle stop. The vehicle stop resulted in the arrest of the driver for attempting to smuggle seven (7) migrants.

23) During a post-arrest interview the driver identified SCHACHT as the recruiter and coordinator for the smuggling attempt. SCHACHT used his phone to direct the driver to locations to pick up illegal aliens and communicate instructions to the driver.

24) Based on all of these facts, I believe that the Target Phone seized during the arrest of Jon SCHACHT was used to communicate with narcotic smugglers, scouts in the area, as well as with other narcotics traffickers known and unknown in order to facilitate the crime of smuggling the narcotics into the United States. Based on the information from prior investigations regarding SCHACHT's activities as an alien smuggler the Target Phone has also been used to communicate

with co-conspirators regarding alien smuggling.

25 Since the date of the arrest, the Target Phone has been in storage at the location described in paragraph 4 (four). The Target Phone has been stored in such a manner that their contents, to the best of my knowledge, are in substantially the same state as when it first came into possession of the USBP.

## TECHNICAL TERMS

26) Wireless telephone: A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

27) Digital camera: A digital camera is a camera that records pictures and video as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard

drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

28) Portable media player. A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock or games. Most cell phones currently manufactured contain portable medial players as a standard feature.

29) Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

30) Based on my training, experience, research, and from consulting the manufacturer's advertisements and product technical specifications available online for these types of cellular phones, and based upon my discussions with experts, I know that the cellular phones which are the subject of this search warrant application most likely have capabilities that allow them to also

serve as a radio communication transmitter, wireless telephone, GPS device, wireless internet connectivity, and text message capabilities, as these are generally standard features. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

31) Based on my knowledge, training and experience, I know that electronic devices such as the Target Phones in this case, can store information for long periods of time. Similarly, things that have been viewed via or uploaded to the Internet are typically stored for some period of time on the device. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person "deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

32) As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Phones were used, where they were used, the purpose of their use, who used them, and when. There is probable

cause to believe that this forensic electronic evidence will be on the Target Phones is more fully set forth in the factual section contained herein and because:

A. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including frequency channels, text messages, video, or photographs.

B. Forensic evidence on a device can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C. A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E. Further, in finding evidence of how a device was used, the purpose of its use, who used it, when and where, sometimes it is necessary to establish that a particular thing is not present on a storage medium, for example, the absence of the entry of a name in a contact list as evidence that the user(s) of the Target Phones did not have a relationship with the party.

## CONCLUSION

33) Based on the foregoing information, there is probable cause to believe that Jon SCHACHT has stored on this Target Phone, evidence related to the smuggling of narcotics and associated scouting activities within the United States. The examination of the Target Phone may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. Because this warrant only seeks permission to examine devices already in the possession of the Border Patrol, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night. The aforementioned Target Phone has been properly stored at the Tucson Station Seized Property Vault and is being transferred to the Tucson Sector Prosecutions Office. Due to the nature of such cell phones, data contained within will remain uncorrupted when being stored for an extended period of time. Therefore, I request that a warrant be issued, allowing for the search of the Target Phone, as described above.

Allen W. Walker, Border Patrol Agent
United States Border Patrol

Subscribed electronically and sworn telephonically
this 2nd day of June 2023:

Honorable Maria S. Aguilera
United States Magistrate Judge
District of Arizona